**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MARY CARROLL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 07 C 1575** |
| ) | |
| **MERRILL LYNCH, and JIM KELLIHER,** ) | **Judge Rebecca Pallmeyer** |
| **PATRICIA KELLIHER** ) | |
| ) | |
| **Defendants,** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Mary Carroll worked as a "trade balancer" for Merrill Lynch's clearing services department in Chicago, Illinois from 1978 until February 2006. In July 2005, Carroll complained about the conduct of one of her supervisors; in this lawsuit, she alleges that as a result of her complaints, she was demoted and subject to threats from co-workers. On Thanksgiving evening, 2005, Carroll called the home of Jim Kelliher, a co-worker, and engaged in a thirteen-minute-long conversation that Kelliher's wife, Patricia, partially recorded. After Jim Kelliher played the taped conversation for Merrill Lynch executives, Carroll was placed on administrative leave and eventually fired. Shortly before Plaintiff's termination, Merrill Lynch deposited and, several days later, withdrew a bonus from her bank account. At Merrill Lynch's request, security staff banned Plaintiff from entering the building where Merrill Lynch's offices were located. Plaintiff nevertheless attempted to interview for jobs with other trading firms in that building. She alleges here that one potential employer declined to hire her based on negative comments from Merrill Lynch.

In this lawsuit, Carroll alleges sex discrimination, hostile work environment, and retaliation in violation of Title VII. Carroll also brings a host of state law claims, including breach of contract, a violation of the Illinois Wage and Payment Collection Act, quantum meruit, tortious interference, violations of the Illinois Eavesdropping Act, intrusion upon seclusion, and intentional infliction of emotional distress. At Defendants' request, this case was stayed from June 2007 to June 2009

while proceedings were ongoing before the Illinois Human Rights Commission. Defendants Merrill Lynch, Jim Kelliher, and Patricia Kelliher now move for summary judgment on all counts.

## **BACKGROUND**[1]

Plaintiff Mary Carroll was employed by Merrill Lynch for more than 25 years, beginning in 1978. During 2005 and early 2006, she held the position of "trade balancer" at Merrill Lynch's clearing services department in Chicago. (Defs.' 56.1(a) ¶ 2.) As a trade balancer, Carroll ensured that trades done on the trading floor were properly recorded, and, if they were not, would work with representatives of other trading firms to resolve inconsistencies. (Defs.' 56.1(a) ¶ 3.) (The precise trading floor or floors involved are not identified in the record.)

Plaintiff's claims center around events that took place between June 2005 and April 2006. In June 2005, Doug Hren was Plaintiff's direct supervisor, and Lou Buttny supervised Hren. (Defs.' 56.1(a) ¶ 3.) Walter Roesch became Vice President of clearing services for Merrill Lynch on August 1, 2005. (*Id.* ¶ 4.) Jim Kelliher, a Defendant in this case, was a trading floor supervisor in the Chicago clearing services department. (*Id.* ¶ 5.)

On July 25, 2005, Plaintiff contacted Merrill Lynch's Employee Service Center to lodge a

---

[1] The court notes that Local Rule 56.1(b)(3) requires that the non-moving party present "a concise response" to the moving party's statement of facts that includes "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." In addition, the non-moving party's statement of additional facts must consist of "short numbered paragraphs" also containing "references to the affidavits, parts of the record, and other supporting materials relied upon." Statements not controverted by the non-moving party will be deemed admitted. The Seventh Circuit requires strict compliance with these rules. *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Defendants have moved to strike Plaintiff's statement of additional facts [150] and Plaintiff's response to Defendants' statement of facts [152] because Plaintiff fails, in many respects, to comply with these local rules. The court agrees that Plaintiff's submissions are deficient in many respects. Nonetheless, in the interest of bringing resolution to a case filed more than four years ago, the court declines to strike these documents in their entirety and has attempted to identify disputes of fact presented by Plaintiff even where her submissions do not comply with the local rules. In many instances, however, where Plaintiff has not offered a statement responsive to Defendants' facts, the court accepts Defendants' version of the facts for the purposes of this motion.

complaint that Hren intended to re-hire an individual, K.J.,[2] whom Plaintiff claims was fired in August 2004 after making death threats against Merrill Lynch employees. (*Id.* ¶ 9; Pl.'s 56.1(b) ¶ 1; Carroll Deposition, Ex. 1 to Pl.'s 56.1(b) at 76-78.) Plaintiff had heard about these threats from a co-worker; no further specifics concerning these threats appear in the record. (Carroll Deposition at 76.) Carroll also reported that her supervisor, Hren, said "Fuck You" to her, though it is not clear under what circumstances or with what frequency. (Carroll Deposition at 78; Pl.'s Resp. ¶ 9.) Carroll complained, in addition, that when Hren learned that she had complained about K.J., Hren called Carroll a "whistle-blower" and told her to "go home and wash your dick."[3] (Carroll Deposition at 78, 86; Pl.'s Resp. ¶ 9; Pl.'s 56.1(b) ¶ 1; Defs.' Ex. E-8 at 2.)

On August 1, 4 or 5, 2005, Carroll called the Employee Service Center again, alleging that Hren had made a racist remark toward one of Carroll's co-workers, Lyric Hill, and had been verbally abusive to another employee, J. F. (Carroll Deposition at 79-80; Pl.'s Resp. ¶ 9; Defs.' Ex. E-8 at 2.) Plaintiff also reported that another employee, C. B., had been repeatedly intoxicated at work. (Carroll Deposition at 79; Pl.'s Resp. ¶ 9.)

---

[2] The court refers to several individuals by their initials in the interest of protecting their identities, as they are not parties to this lawsuit, and the truth of the allegations against them is not at issue.

[3] The record is inconsistent as to when Hren allegedly made this statement and how he found out about Plaintiff's complaint regarding K.J. In her deposition, Plaintiff testified that Hren made the comment a couple of days before she first called the Employee Service Center, and that this comment was one reason she made that call. (Carroll Deposition at 86-87.) In her EEOC complaint, Plaintiff said that Hren made the comment on July 29, 2005, which was after her first call to the Employee Service Center. (Defs.' Ex. E-8 at 2.) In her statement of facts in response to this motion, Plaintiff offers no date for this comment, but asserts that it occurred "based on her report regarding [K.J.]." (Pl.'s 56.1(b) ¶¶ 1-2.) Plaintiff's statement of facts indicates that she complained about K.J. in a call to the Employee Service Center on July 25 (the record is also inconsistent as to whether this call was anonymous), and to Lou Buttny. (*Id.*) The only record evidence regarding her complaint to Buttny is a series of e-mails from August 2004, one year before the events at issue. (Ex. 28 to Pl.'s 56.1(b).) Defendants acknowledge that Hren "made inappropriate comments" to Plaintiff prior to her late July 2005 call, but do not specify what those comments were or in what context they were made. (Defs.' 56.1(a) ¶ 9; Defs.' Resp. ¶ 2.) Hren was fired "as a result" of those comments. (Defs.' Resp. ¶ 2.)

In late July and August, Joanne Gonzalez, a Merrill Lynch Employee Relations representative, investigated Plaintiff's complaints, met with some of Plaintiff's co-workers, and met with Plaintiff herself on August 18, 2005. (Defs.' 56.1(a) ¶ 10; Defs.' Ex. E-8 at 2.) Gonzalez reported her findings to Roesch and others within Merrill Lynch's management. (Defs.' 56.1(a) ¶ 11.) After reviewing Gonzalez's findings, Roesch decided to fire Hren and his supervisor, Buttny, based on Hren's remarks and Buttny's failure to address Hren's behavior. (*Id.* ¶ 12.) On August 25, 2005, the day that Hren and Buttny were terminated, Roesch held a department-wide meeting in which he announced the terminations and directed that employees not discuss the matter further. (*Id.* ¶ 14.) Plaintiff overslept that day and did not report to work; Roesch called her at home to relay the same information to her. (*Id.* ¶ 15.) That night, Hren called Plaintiff at home to apologize for his behavior, but warned her that people were upset that he had been fired, and that she should "watch her back." (*Id.* ¶ 16.) (Who in particular was upset, and how Hren knew about it, are unexplained. (Carroll Deposition at 100-102.)) Plaintiff stayed home from work the next day and reported Hren's comment to Gonzalez. (Defs.' 56.1(a) ¶ 17.) Merrill Lynch management contacted Hren and told him not to contact Plaintiff again. (*Id.* ¶ 18.) Roesch convened a second department-wide meeting either the day Carroll returned to work or the day after (August 27 or 28) to remind everyone not to discuss Hren and Buttny's terminations. (*Id.* ¶ 19; Roesch Deposition, Ex. D to Defs.' 56.1(a) at 55.)

After firing Hren and Buttny, Roesch restructured the Clearing Services department. (Defs.' 56.1(a) ¶ 20.) Roesch moved Liz Creek, a supervisor from another (unidentified) department to Clearing Services, where she assumed Buttny's job. (*Id.*) Jim Kelliher, the morning floor supervisor, and Mike Culhane, the afternoon floor supervisor, who (like Hren) had reported to Buttny prior to his and Hren's termination, now reported to Creek, who in turn reported to Roesch. (*Id.* ¶ 21; Roesch Deposition at 37-40.) After the terminations, Kelliher and Culhane absorbed Hren's responsibilities. (Defs.' 56.1(a) ¶ 21.) Plaintiff was re-assigned so that she would report to

Karen Klatt, who in turn reported to Jim Halm, a supervisor at an equivalent level to Creek. (*Id.* ¶ 22.) Plaintiff and her fellow trade balancers, who were now all under the supervision of Halm, were moved from the 11th floor to the 25th floor in mid-September 2005. (Defs.' 56.1(a) ¶ 33.)

When Plaintiff returned to work following her two-day absence, Roesch met with her in person to explain the department's restructuring. It is undisputed that Carroll's official title, salary, and benefits were not changed as a result of this restructuring, but Carroll nevertheless contends that Roesch told her in this meeting that her position no longer existed. (*Id.* ¶ 23.) As the court understands what she means by this, it is a reference to Carroll's telling Roesch during this meeting that she had been serving as a "back-up" for Hren, effectively acting as a supervisor from 5 a.m. until Hren himself arrived "a couple of hours" later. (Pl.'s 56.1(b) ¶ 12; Carroll Deposition at 106-07, 118-19.) According to Plaintiff, in her role as Wren's "back-up," she helped distribute work, dealt with attendance issues, and answered questions from other employees in her department. (Carroll Deposition at 118-119.) Plaintiff claims that she supervised five employees, and also completed a weekly report for Hren and Buttny (neither a description of the content of that report, nor any examples of it, appear in the record). (Pl.'s 56.1(b) ¶ 12; Carroll Deposition at 119, 123.)

Plaintiff offers no evidence of these supervisory responsibilities aside from her deposition testimony, and Defendant denies that she had any supervisory responsibilities aside from reporting attendance issues to Hren. (Defs.' Resp. ¶ 12.) Roesch testified that until he met with Carroll, he was unaware that employees called Carroll regarding their attendance at work. (Roesch Deposition, Ex. 6 to Pl.'s 56.1(a) at 27, 32.) Roesch explained that he put an end to that practice, and although he does not specify the actions that were taken to do so (and it is not explained anywhere else in the record), he does suggest it was a policy change, ostensibly one that was communicated to employees. (*Id.*) Roesch explained that, "I don't believe in having people call their co-workers when they are not going to come to work. They call their supervisor. If their supervisor is not available they need to call their vice president." (*Id.* at 32.)

5

At the meeting with Roesch two days after Hren and Buttny's firings, Plaintiff also raised the matter of a potential promotion to assistant vice president that she claimed to have discussed with Buttny. (Defs.' 56.1(a) ¶ 27.) Roesch told her he was unaware of these discussions, and asked her to provide him with any information she had regarding them. Defendant claims she never did so. (Defs.' 56.1(a) ¶ 28.) Plaintiff asserts that there is an e-mail reflecting this discussion with Buttny, but she has not placed it in the record and can "not recall at this time (5 years later) if she provided the document to Roesch." (Defs.' 56.1(a) ¶ 28; Pl.'s Resp. ¶ 28.) After the meeting, Plaintiff began questioning other employees about their job duties. (Defs.' 56.1(a) ¶ 26; Pl.'s Resp. ¶ 26.) Without any elaboration or supporting evidence, Plaintiff asserts that she "was asking about other employees work duties because the employer claimed the changes were broader, department wide but the lead duties continued to exist on other shifts thus the removal from only the Plaintiff strengthened Plaintiff's reasonable belief that the Plaintiff was punished for complaining and causing two males to be fired." (Pl.'s Resp. ¶ 26.)

Plaintiff claims that in the days after she returned to work, she was subjected to threats because of Hren and Buttny's firings. She alleges that a co-worker, C. B., told her he would "kick her ass," and that another co-worker, C. K., threatened to "kick her teeth down her throat." (Pl.'s 56.1(b) ¶ 13; Defs.' Ex. E-8 at 3.) Plaintiff contends that C.B. and C.K. made these threats "because of their belief that Plaintiff was responsible for Buttny and Hren being fired," but she offers no record evidence that the threats were made for this reason. (Defs.' Ex. E-8 at 3.) Plaintiff also claims that several men looked at her and placed their hands on their crotches, though it is not clear who these men were, whether they worked for Merrill Lynch, when these events occurred, or how they related to the firings of Hren and Buttny. (Defs.' 56.1(a) ¶ 29.) During the next few months, Plaintiff called Joanne Gonzalez to complain about these incidents, but despite requests from Gonzalez and others in the Employee Service Center, Plaintiff refused to provide the names of those about whom she was complaining. (Defs.' 56.1(a) ¶¶ 29, 30.) Plaintiff contends that she

would have provided the names, but requested a face-to-face meeting with Gonzalez or Roesch before she would do so, and that meeting was never arranged. (Pl.'s Resp. ¶ 30.) Plaintiff suspects that Gonzalez had disclosed Plaintiff's complaints about Hren; because Plaintiff concludes that Gonzalez had breached a promise of confidentiality about the matter, Plaintiff no longer trusted Gonzalez. (*Id.*) On September 15, 2005, in response to Plaintiff's unspecified allegations of threats, Creek and Halm (Plaintiff's new supervisor) held a meeting with their staffs to explain Defendant's zero-tolerance policy toward harassment. (Defs.' 56.1(a) ¶ 32.)

On September 22, 2005, Plaintiff asked Creek about a vacant afternoon Trade Checking Supervisor position. (Defs.' 56.1(a) ¶ 34.) (The record is not clear as to why Creek, who was not Plaintiff's supervisor, was the contact person for this position.) Plaintiff told Creek "shortly thereafter" (exactly when is not specified) that she was not interested in the position. (Defs.' 56.1(a) ¶ 35; Pl.'s Resp. ¶ 35.) On September 28, 2005, Plaintiff e-mailed Creek and asked her whether she had been considered for the position, and Creek explained that she had not been considered because she had not applied. (Defs.' 56.1(a) ¶ 36-37.) Plaintiff contends she did not apply because of "Defendant's procedure of asking certain people to apply, thus being the chosen ones for the position." (Pl.'s Resp. ¶ 36.)[4] As evidence of the existence of this "procedure," Plaintiff cites only her own deposition. (Pl.'s Resp. ¶ 37.) On September 29, 2005, after she raised questions about not being chosen for the position, Plaintiff met with Roesch and Creek. (Defs.' 56.1(a) ¶ 38; Defs.' Ex. 23.) Defendant claims that during this meeting, Plaintiff became "hysterical" and began screaming; Plaintiff denies having become "hysterical" but acknowledges that "she was upset and cried." (Defs.' 56.1(a) ¶ 39; Pl.'s Resp. ¶ 38.) It is undisputed that Plaintiff did not apply for the position. (Defs.' 56.1(a) ¶ 38; Carroll Deposition at 153.)

---

[4]     Plaintiff's response to Defendants' 56.1(a) statement is numbered differently than Defendants' statement in several instances, and Plaintiff's paragraph 36 responds to Defendants' paragraph 37.

On October 21, 2005, Plaintiff complained to her immediate supervisor, Karen Klatt, that people on the 11th floor, where she had previously worked, were not picking up her phone calls. (Defs.' 56.1(a) ¶ 41.) In their statements of fact, neither Plaintiff nor Defendant offers specifics about what occurred in response to this complaint, but Plaintiff has submitted an October 22 e-mail message from Creek to Roesch about the matter, and the court notes that Roesch's testimony on the issue appears to be limited to the information in this e-mail. In the e-mail, Creek explains that Klatt told her that Plaintiff had said "*people* on 11 were not picking up *her* calls." (E-mail from Liz Creek to Walter Roesch of 10/22/05, Ex. 9 to Pl.'s 56.1(b).) Creek wrote that, "[C.B][5] was up here yesterday morning manning the phones while everyone else was down on the trading floor." (*Id.*) Creek continued, "I asked [C.B.] if he was picking up all calls while we were out and he said yes. I asked him to make sure he picked up all the calls and took (sic) messages if necessary." (*Id.*) Creek then detailed her further discussion with C.B. in which C.B. reportedly explained that he thought Plaintiff was "reacting" because he had turned off Lyric Hill's radio earlier in the week, and that he thought "Mary is after him and that she is trying to get him in trouble." (*Id.*) There does not appear to have been any additional follow-up by Creek, and the record contains no additional accusations from Carroll that her calls continued to go unanswered.

On October 24, however, while on a phone call with an unidentified individual (about whom no details are offered anywhere in the record), Plaintiff announced that she was going to make a "big deal" about this issue, and that "she was not going to lose on this." (Defs.' 56.1(a) ¶ 43.) Klatt overheard this conversation and e-mailed Halm about it. (Roesch Deposition at 71.) Plaintiff does not deny that she made these statements, but alleges that she was "overheard in a phone call" and that "Roesch admitted he exaggerated the facts to make the Plaintiff look bad." (Defs.' Resp.

---

[5] C.B. is the same individual that Plaintiff alleged had threatened her. Plaintiff does not, however, discuss any connection between that earlier threat and this incident with the phone calls anywhere in the record, or otherwise note that it was this individual in particular who allegedly did not pick up her phone calls.

¶¶ 42-43.) Plaintiff does not explain what facts Roesch allegedly exaggerated, how they were exaggerated, or to whom or in what context they were exaggerated. It does not appear from the record that Plaintiff ever took any additional action regarding unanswered phone calls, such as filing a formal complaint, and the record is likewise silent as to whether Defendant took any additional action.

Evidently during this same period of time (the episode is mentioned in the October 22 e-mail from Creek to Roesch), Plaintiff questioned Jim Kelliher, a trading floor supervisor, about his job duties; Kelliher responded by telling Plaintiff that he supervised trading floor activities and trade checkers. (Defs.' 56.1(a) ¶ 46.) Plaintiff concluded that Kelliher was doing "her [Plaintiff's own] job," and told him so. (Defs.' 56.1(a) ¶ 47.) Plaintiff explains that she "was upset by giving of her job duties to a 'do nothing' employee" and that she "believed Kelliher was given the duties she [formerly] had, and that he received these duties based on her demotion." (Pl.'s Resp. ¶ 47.) Plaintiff does not identify the individual(s) responsible for assigning her duties to Kelliher.

On Thanksgiving evening, November 24, 2005, Plaintiff placed a call to Kelliher's home. (Defs.' 56.1(a) ¶ 47.) As Plaintiff acknowledged in her deposition, she used profanity in this call, yelled at Kelliher, and was "all riled up" and "angry." (Defs.' 56.1(a) ¶ 48.) Plaintiff and Defendants agree that a portion of the telephone call was recorded by Kelliher's wife, Patricia, but disagree about other circumstances surrounding the phone call. Plaintiff's own version is confusing: Plaintiff asserts that she made two phone calls to the Kellihers, the first lasting 13 minutes and the second lasting 18 minutes, but in that same paragraph, she claims that she made one phone call at 8:59 p.m., and a second call just one minute later, at 9 p.m., when that first call "was cut off and ended." (Pl.'s 56.1(b) ¶ 31.) Plaintiff's phone records themselves show that one phone call to 411 was made at 8:59 p.m., lasting 14 minutes, and that one phone call was made to Kelliher at 9 p.m., lasting 13 minutes. (Ex. 15 to Pl.'s 56.1(b).) The record of the 411 call contains a code, "DA Call," for "Directory Assistance Call." The record of Plaintiff's second call, the call to the Kellihers,

contains a code, "DACC," which, according to the legend contained within the telephone bill, stands for "Directory Assistance Call Completion." The court concludes that the only plausible explanation for the overlapping calls is that calls to Directory Assistance that result in a "call completion" to the requested number are recorded as including minutes devoted to the completed call, in addition to the time devoted to Directory Assistance. Thus, in this case, Plaintiff made a one-minute call to Directory Assistance and was connected to the Kellihers for a single thirteen-minute call. The record contains no support for Plaintiff's theory that she made two calls to the Kellihers because the two calls in her phone record—one to Directory Assistance and one to the Kellihers—are the only ones made from Plaintiff's phone that night. The next call from her phone after the conclusion of the thirteen-minute call to the Kellihers was not made until 10:56 a.m. Friday, November 25.

Adhering to her contention that she made two calls to the Kellihers, Plaintiff contends that both she and Kelliher were "inappropriate" during the first call, but that during the second call Kelliher was "very calm" because (she surmises) he knew that he was recording the conversation. (Carroll Deposition at 178.) Neither Plaintiff nor Defendants discuss the substance of the conversation in their statements of fact, and no recording of the conversation is in evidence. There does appear to be a transcript in the record (Defs.' Ex. 64), but it is cited by Defendants only in passing and has not been authenticated. Plaintiff offers a memorandum that Kelliher prepared the day after receiving the call, wherein he explains that:

> Mary [Carroll] was clearly angry and upset about something, judging by the tone of her voice. She began by accusing me of making some type of comment that she felt was referring to her. I didn't understand what she was talking about and repeatedly told her this. She never explained exactly what was said, when it was allegedly said, and to whom it was said. All that she kept repeating was that she wants to give me a chance to acknowledge that I did say something. Once again, I told her, "I don't know what you're talking about."

(Ex. 17 to Pl.'s 56.1(b).)

Jim Kelliher's wife, Patricia Kelliher, testified that she could hear Plaintiff's voice on the phone from across the room. (Defs.' 56.1(a) ¶ 50.) Concerned by the tone and volume, Ms.

Kelliher went upstairs to listen in on the call from another telephone and hit a button on the nearby answering machine, causing a portion of the conversation to be recorded. (Defs.' 56.1(a) ¶ 51.) Patricia Kelliher testified that Plaintiff's "tone made me feel threatened" and that she anticipated reporting the call to police. (Defs.' Resp. ¶ 35.) Plaintiff contends that the recording "was part of a plan to record the Plaintiff to cause her termination," but the only support she cites for this contention is her own testimony. (Pl.'s Resp. ¶ 51.)

Defendants contend that, prior to the phone call, Plaintiff and Kelliher did not have any disputes over work-related issues, and that Kelliher did not serve as Plaintiff's supervisor. (Defs.' 56.1(a) ¶ 54.) As Kelliher explained in the excerpt from his e-mail summarizing the phone call referenced earlier (Ex. 18 to Pl.'s 56.1(b)), he did not know why she had called him, and during the course of the phone call was not informed of any reason for Plaintiff's call. In her deposition testimony, however, Plaintiff claims that she placed the call because she believed Kelliher had told co-workers he had been promoted because of Hren and Buttny's firings. (Carroll Deposition at 173-74.) There is no evidence in the record to support this contention; as described earlier, Kelliher held the same position both before and after the firings. The only co-worker identified in the record who allegedly told Plaintiff about Kelliher's alleged statements is "John Figueroa," (Carroll Deposition at 173), a person not mentioned anywhere else in the record. Carroll testified that Kelliher had "plenty of conversations with just about everybody in the office," but specifies no one else. (*Id.*)

Plaintiff notes that Kelliher's alleged statement that he had benefitted from the firings was not what upset her; rather, she was upset "[b]ecause I went to work every day and worked. I mean, to see somebody come in and do nothing and move up the chain, it just made no logical sense to me." (Carroll Deposition at 174.) Plaintiff also testified that she and Kelliher had an ongoing dispute about a set of window blinds in an unidentified room in the Merrill Lynch offices, which she claimed Kelliher would regularly shut, over her objection. (Carroll Deposition at 171-72.) (How a

squabble about window blinds relates to any claim in this lawsuit is wholly unexplained.)  Further, Plaintiff explains she made the call at the advice of a counselor from the Merrill Lynch Employee Assistance Program, who reportedly suggested that Plaintiff "reach out to people and tell them how [threats of retaliation for Hren and Buttny's firing] were effecting (sic) me."  (Pl.'s 56.1(b) ¶ 30.) Defendants admit Plaintiff utilized the Employee Assistance Program, but argue that it is "immaterial" whether a counselor suggested she reach out to other co-workers.  (Defs.' Resp. ¶ 30.)

After the Thanksgiving evening call, Kelliher called his supervisor, Creek, and left a message for her regarding the phone call.  (Defs.' 56.1(a) ¶ 55.)  Kelliher followed up the next day by typing up the above-referenced summary of his conversation and forwarding it to Creek and Roesch.  (Defs.' 56.1(a) ¶ 57.)  Kelliher also discussed the call in person with Creek and over the phone with Roesch.  (Defs.' 56.1(a) ¶ 58.)  At Roesch's request, Kelliher and his wife played the tape she had made of a portion of the phone call in a conference call with Creek.  (Defs.' 56.1(a) ¶¶ 59-60.)  Roesch himself recorded the playback on a "recorded line" in New Jersey (where Merrill Lynch has its headquarters) so that other management officials could listen to the call later if necessary.  (Defs.' 56.1(a) ¶ 61.)

Plaintiff, too, discussed the phone call on that Friday, November 25, with Klatt and Halm, her supervisors.  (Carroll Deposition at 198.)  She also described the call to her co-worker, Lyric Hill, via instant messaging; when Hill expressed surprise that Plaintiff had called Kelliher at home, Carroll responded, "I just fucking snapped."  (Carroll Deposition at 200-01.)  That same afternoon (November 25), Jim Kelliher transferred the recorded phone call on the answering machine to a cassette tape in order to play it for the police.  (Defs.' 56.1(a) ¶ 64.)  Also in the afternoon of November 25, the Kellihers reported the incident to the Orland Park Police Department.  (Ex. 25 to Pl.'s 56.1(b).)  It is not clear precisely when the Kellihers decided to report the incident to police, but there is no suggestion in the record that doing so was the result of discussions with Merrill Lynch employees.

On Monday, November 28, Al Howell, Roesch's supervisor, and Frank Dimarco, Howell's supervisor, listened to the recorded portion of the telephone call. (Defs.' 56.1(a) ¶ 65.) Roesch concluded that Plaintiff should be fired based on an "escalating pattern of erratic and highly inappropriate behavior which culminated in her threatening phone call to the Kellihers." (Defs.' 56.1(a) ¶ 66.) On Tuesday, November 29, 2005, Roesch, aware that Plaintiff had already retained counsel,[6] placed Plaintiff on administrative leave pending discharge so that her attorney and Merrill Lynch could work out the terms of her departure and avoid litigation. (Defs.' 56.1(a) ¶ 68.) (It is not specified whether this leave was paid or unpaid.) On December 6, 2005, Merrill Lynch informed Plaintiff's attorney that they intended to fire her. (Defs.' 56.1(a) ¶ 69.)

During this period of time, while Plaintiff was on administrative leave, Merrill Lynch claims that it "erroneously" deposited a $4,000 gross ($2,316 net) bonus into Plaintiff's bank account. Merrill now contends Plaintiff was not entitled to this bonus because only employees in "good standing" are eligible for a discretionary bonus. (Defs.' 56.1(a) ¶ 74.) Merrill retracted the funds six days after depositing them when it became aware of the error. (Defs.' 56.1(a) ¶ 75; Carroll Deposition at 224.) The record is silent concerning who it was that recognized the error or how, when the decision to retract the funds was made, or who specifically made the decision.

On January 18, 2006, Plaintiff filed a police report against the Kellihers for recording her without her permission. (Defs.' 56.1(a) ¶ 70.) It is unclear when or how Plaintiff learned that she had been recorded, but in an e-mail to her attorney sent on Dec. 12, 2005, Plaintiff says, without elaboration, that Roesch "made it a point to tell me the call was being recorded." (Ex. 23 to Pl.'s 56.1(a).) The Orland Park Police Department investigated the complaint, conducting several interviews between January 25, 2006 and January 31, 2006. (Orland Park Police Report 2006-

---

[6]     The record does not reveal precisely when Plaintiff first retained counsel or for what reason, but it is clear that she had done so by October 20, 2005. On that date, her attorney sent an e-mail message to Merrill Lynch officials regarding the threats allegedly made against Plaintiff in the wake of Hren and Buttny's firings. (Ex. 8 to Pl.'s 56.1(b).)

000479a, Ex. 27 to Pl.'s 56.1(b).)  On February 27, 2006, the police officer investigating the complaint contacted Assistant State's Attorney Michelle Forbes, who had been previously apprised of the investigation, and she informed him that "no crime has occurred" and that the office would not pursue a prosecution.  (*Id.*)

On February 9, 2006, Plaintiff was officially terminated after her attorney and Merrill Lynch were unable to agree on the terms of her separation.  (Defs.' 56.1(a) ¶ 72.)  (The precise manner in which Plaintiff was informed of her termination is not discussed in the record.)  On February 14, 2006, Roesch received a message from building security staff that Plaintiff had recently asked them to investigate an incident that occurred at least 11 years earlier, in which an individual employed by Merrill Lynch prior to 1995 had shot a pellet gun toward Plaintiff and Lyric Hill; there is no allegation she was hit.  (Defs.' 56.1(a) ¶ 76; Carroll Deposition at 233.)  Building security staff asked Plaintiff to instead report the incident to Merrill Lynch, but she had refused to do so.  (Defs.' 56.1(a) ¶ 77.)  Viewing this behavior as erratic, Roesch directed building security to place Plaintiff on a list of individuals banned from the building.  (Defs.' 56.1(a) ¶ 78.)

Plaintiff claims that on April 24, 2006, she attempted to apply for a job with another employer that occupied space in the same building as Merrill Lynch, 440 South LaSalle Street, but was denied access.  (Pl.'s 56.1(b) ¶ 57.)  Plaintiff does not specify who this employer was or offer any further details.  (*Id.*)  On April 27, 2006, Plaintiff's attorney contacted William Bubb, a Merrill Lynch attorney, to inform him that Plaintiff had been offered a job with a company based in the Merrill Lynch building, "Trading Services, LLC" and needed the ban lifted, as she would be starting work on May 15, 2006.  (Ex. 41 to Pl.'s 56.1(b).)  Plaintiff has offered no other evidence of a job offer, and no further specifics concerning "Trading Services, LLC" appear in the record.  The e-mail does suggest this is the same employer that Plaintiff had attempted to visit on April 24; her attorney wrote that Plaintiff "was able to meet with the interviewer elsewhere and was offered the job."  (Ex. 41 to Pl.'s 56.1(b).)  Bubb responded on May 2, explaining that "[w]e are working to get this resolved."

(Ex. 41 to Pl.'s 56.1(b).)  Defendant claims that Roesch immediately lifted the ban after being informed of the situation, and Plaintiff does not dispute that the ban was lifted on May 2.  (Defs.' 56.1(a) ¶ 79; Pl.'s 56.1(b) ¶¶ 59-60.)  That same day, Plaintiff sent an e-mail to her attorney explaining that she had called the hiring manager of "Chicago Trading Services" to inform him that the ban on her entering the building had been lifted and was told "Merrill said not to hire me, specifically to 'steer clear of her.'"  (Ex. 43 to Pl.'s 56.1(b).)  The record is unclear as to whether any additional discussions between Plaintiff and this firm ever took place.  Plaintiff's attorney sent an e-mail to Bubb on May 3, asserting that Plaintiff had been denied a job by a firm called "Flematt" because of what individuals at Merrill Lynch said about her.  (Ex. 38 to Pl.'s 56.1(b).)  (It is unclear whether Flematt, Chicago Trading Services, or Trading Services LLC, are the same company.)

In response to this sequence of events, Carroll has filed a number of administrative charges. On January 17, 2006, she filed a charge with the Illinois Department of Human Rights alleging discrimination based on a physical handicap and retaliation for having complained about sexual harassment.  (2006CF1741, Ex. 29 to Pl.'s 56.1(b) at 1, 2.)  In this initial charge, Plaintiff claimed to suffer from a back injury and alleged that "[o]n or about July 24, 2005, Respondent failed to accommodate me.  The accommodation consisted of making my work station ergonomic."  (*Id.*) Plaintiff also charged that she was retaliated against for complaining about sexually offensive comments made by Hren.  (*Id.* at 2.)  The disposition of this charge is not clear from the record.

Carroll filed another charge with the IDHR and EEOC on March 2, 2006, alleging sexual harassment and retaliation based on her complaints about that sexual harassment.  (440-2006-02225, Ex. 29 to Pl.'s 56.1(b) at 1.)  In this second charge, Plaintiff alleged that beginning on August 1, 2005, she was subject to sexual harassment, that Merrill Lynch failed to investigate the harassment, and that she was subject to further sexual harassment as a consequence of reporting the first incident of sexual harassment.  (*Id.*)  Plaintiff also alleged that she had been demoted as a result of reporting this harassment.  (*Id.*)  The EEOC dismissed that complaint on December 20,

15

2006, because "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (*Id.*)

Plaintiff filed a third charge with the EEOC and IDHR on July 14, 2006, alleging that Merrill Lynch provided information to a prospective employer that caused it to rescind a job offer to Plaintiff. (Defs.' 56.1(b) ¶ 84; 440-2006-04517, Ex. 50 to Defs.' 56.1(a).) The EEOC dismissed the July 14 charge on December 20, 2006 for lack of jurisdiction without any further comment. (Defs.' 56.1(b) ¶ 87; Ex. 53 to Defs.' 56.1(a).)

Plaintiff filed a complaint with the Illinois Human Rights Commission on February 12, 2007, alleging failure to accommodate her (unspecified) handicap, sex discrimination, and retaliation, alleging essentially the same facts described above. (Defs.' Ex. E-8.) Plaintiff filed an amended complaint with the Commission July 18, 2008, omitting reference to any handicap, but alleging "egregious sexual orientation discrimination, harassment, retaliation and related illegal conduct." (Defs.' Ex. E-10 ¶ 1.) On April 9, 2010, the Commission dismissed Plaintiff's complaint on the ground that it alleged sexual orientation discrimination, which was not prohibited by the Illinois Human Rights Act at the time the alleged events occurred. (Defs.' 56.1(b) ¶¶ 88-89; Ex. E-2 to Defs.' 56.1(a) at 7.)

Plaintiff alleges that as a result of Defendants' unlawful conduct, she has attempted suicide, ended her relationship with her long-term partner, and suffered depression for which she needs prescription medication. (Pl.'s 56.1(b) ¶ 63.) In her complaint in this court, she alleges discrimination, harassment, and retaliation in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Count I); that she has been deprived of wages and benefits under the Illinois Wage Act, 820 ILCS 115/1 (Count II); breach of written or oral contract (Count III); quantum meruit (Count IV); intrusion upon seclusion (Count V); violation of the Illinois Eavesdropping Act, 720 ILCS 5/14-1 (Count VI); intentional infliction of emotional distress (Count VII); and tortious interference with contractual relations (Count VIII). All claims are brought against Merrill Lynch, and the intrusion upon

seclusion, eavesdropping, and IIED claims are also brought against Patricia and Jim Kelliher.

**DISCUSSION**

The court will grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on a motion for summary judgment, the court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors," however. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). The Seventh Circuit has explained that summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quotation and citation omitted). It has also been recognized that "[d]iscrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits speculating about the defendant's motives." *Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).

## I.     Title VII

Plaintiff alleges discrimination, harassment, and retaliation in violation of Title VII. Defendant argues, first, that these claims fail in their entirety because her allegations are based on sexual orientation, not on sex discrimination, and therefore fall outside Title VII's domain.[7] Because the court believes Plaintiff's charges can be read as asserting sex discrimination claims, and because this lawsuit has been pending for more than four years, the court declines to address the argument that Plaintiff has stated only sexual orientation discrimination claims. Defendant does

---

[7]     Plaintiff concedes that sexual orientation discrimination is not actionable under Title VII. (Response at 12.) "Sexual orientation is not a classification that is protected under Title VII; thus homosexuals are not members of a protected class under the law." *Hamner v. St. Vincent Hosp. and Health Care Center, Inc.*, 224 F.3d 701, 707 (7th Cir. 2000).

argue, albeit briefly, that Plaintiff's sex discrimination claims fail on the merits (Defs.' Br. at 12 n. 8), and the court will therefore determine whether Plaintiff has created a genuine issue of material fact as to whether any Title VII violation has occurred. Plaintiff does not allege her Title VII claims with any specificity; rather, she alleges generally that all of the actions she describes constitute discrimination, hostile work environment, and retaliation. The court examines these claims based on the conduct that could reasonably support them.

## A.    Discrimination

All of Plaintiff's allegations regarding sex discrimination appear to rest on Plaintiff's claim that she was denied a promotion. According to Plaintiff, "Lou Buttny liked to promote white men who were married and had children." (Response at 17.) Plaintiff does not specify whether she proceeds under the direct or indirect method on this claim, but the court notes that under either method, Plaintiff must present evidence that she suffered an adverse employment action. Thus, the direct method of proof requires that Plaintiff be a member of a protected class and suffer an adverse employment action by virtue of her membership in that class. *Burks v. Wisconsin Dep't of Trans.,* 464 F.3d 744, 750 n.3 (7th Cir. 2006). Plaintiff must present direct or circumstantial evidence of a discriminatory reason for the adverse action. *Id.* Under the indirect method, Plaintiff must establish that she was a member of a protected group; that she was qualified for a promotion; that she was denied the promotion; and that the position was given to a person of similar or lesser qualifications outside the protected group. *Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009).

In short, to survive summary judgment on her sex discrimination claim, Plaintiff must present evidence that Buttny's alleged refusal to promote her constitutes an adverse action. "Failure to promote can be an adverse action giving rise to liability, . . . but the plaintiff must first show that she properly applied for the position." *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) (citations omitted). Plaintiff has not met this test. She has offered no evidence that during the time that

Buttny was her supervisor, there was any position available into which she could be promoted. The only reference in the record to Buttny's alleged failure to promote Plaintiff is a comment Plaintiff made in her conversation with Roesch after Buttny and Hren were fired: Plaintiff told Roesch that Buttny considered promoting her but did not do so.  In response, Roesch asked Plaintiff to forward to him any information she had regarding her discussions about a promotion.  (Defs.' 56.1(a) ¶ 28.) Defendant asserts that it never received any information concerning these discussions.  (*Id.*) Plaintiff believes there is an e-mail about the matter but acknowledges that she "[can]not recall at this time (5 years later) if she provided the document to Roesch."  (Defs.' 56.1(a) ¶ 28; Pl.'s Resp. ¶ 28.)  There is, thus, no record of any discussions of promotion–e-mail or otherwise–in the record. Plaintiff has not identified with any specificity any position for which he applied and was passed over.  Nor has Plaintiff presented evidence that a person in her circumstances was entitled to any automatic increase in rank or pay grade.  There is no genuine issue of material fact on this claim sufficient to survive summary judgment.

The court notes, further, that Plaintiff has not alleged or asserted that Lou Buttny himself ever engaged in any discriminatory conduct.  Plaintiff herself found it "shocking" that Buttny was removed in response to Plaintiff's complaints about Hren, and agreed that her complaint about Lou was about "lack of management supervision."  (Carroll Deposition at 88-89.)  Plaintiff testified that, "Lou just didn't like me at all. I don't know why."  (*Id.*)  Plaintiff also testified that Buttny told her if she wanted to be considered for a promotion she should "be more assertive" and "take on a little bit more responsibility."  (*Id.* at 94.)  Without more, these ambiguous comments are insufficient to establish that Plaintiff was denied appointment or promotion to any available position for discriminatory reasons.

Plaintiff has also alleged that she was passed over for a promotion to floor trader supervisor in September 2005.  She acknowledges, however, that after inquiring about applying for the position and being sent a link to the application, Plaintiff had second thoughts and told Liz Creek

that she was not interested in the position. (Defs.' 56.1(a) ¶ 35; Pl.'s Resp. ¶ 35.) Plaintiff now contends she did not apply because of "Defendant's procedure of asking certain people to apply, thus being the chosen ones for the position," but apart from her own deposition testimony, Plaintiff presents no evidence that any such procedure or policy existed. (Pl.'s Resp. ¶ 36.) Further, Plaintiff makes no argument that Liz Creek, a woman, did anything to suggest she did not want to promote women. Finally, the court notes that any effort to establish discrimination pursuant to the indirect method fails because Plaintiff has not identified any similarly-situated employees outside of the protected class who were treated more favorably. In fact, the record shows that Buttny was replaced by a woman, Liz Creek. Another woman, Karen Klatt, also served as a supervisor. (Defs.' 56.1(a) ¶¶ 20, 21.) This claim is dismissed.

### B. Hostile Work Environment

To survive summary judgment on a hostile work environment claim, Plaintiff must establish a genuine issue of material fact that: (1) the work environment was subjectively and objectively offensive; (2) her protected status—in this case, her sex—was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010) (citation omitted). Employer liability may be established by proving that a supervisor participated in the harassment that created the hostile work environment, or that the employer was negligent in discovering or remedying the harassment. *Id.* at 390. Furthermore, "[a]n employer can generally avoid liability for a hostile work environment if it promptly investigated complaints made by the plaintiff and acted to stop the harassing behavior." *Id.* at 392 (citation omitted).

Plaintiff's allegations of harassment–construed most broadly in her favor–consist of Hren's use of profanity ("Fuck You" and "Go home and wash your dick" (Pl.'s Resp. ¶ 9)); two other employees allegedly threatening her ("Kick [your] ass" and "Kick [your] teeth down [your] throat"); and unnamed individuals (who may or may not have been employees of Defendant) grabbing their

crotches in her presence.  (Pl.'s 56.1(b)  ¶ 13; Defs.' 56.1(a) ¶ 29.)  For purposes of this motion, the court will assume that these incidents were motivated by Plaintiff's sex,[8] and that these incidents (though arguably isolated and disconnected) establish a "severe and pervasive" pattern of harassment.  The hostile environment claim nevertheless fails because once Plaintiff complained to Merrill Lynch managers, they acted swiftly in response to her complaints.  It is undisputed that Merrill Lynch fired both Hren and Buttny almost immediately after Plaintiff complained.   When Plaintiff complained that she had been harassed as a result of the firings, Merrill Lynch officials convened a meeting at which they warned employees in Plaintiff's department that anyone who made threats or inappropriately discussed the firings would be immediately terminated.  In fact, Merrill Lynch also indicated it wanted to do *more* in response to Plaintiff's complaints but could not because Plaintiff would not provide additional information.  In an October 21, 2005, e-mail from Merrill Lynch attorney Bubb to Plaintiff's attorney, Bubb writes:

> [I]f we know the identity of the individuals who Mary says have engaged in [threatening] behavior, we can contact them, let them know about the allegations and that we are investigating them, and warn them under the threat of discharge not to engage in such activity. . . . If Mary decides not to do that, I feel we must nevertheless look into her complaints because of their nature, so we cannot honor her request that we do nothing.

(Ex. 8 to Pl.'s 56.1(b).)

To demonstrate employer liability, Plaintiff "must demonstrate that [she] made a concerted effort to inform [Defendant] of the [sex] harassment [she] was allegedly experiencing." *Montgomery*, 626 F.3d at 391.  Plaintiff argues that she was unwilling to provide names to Merrill Lynch officials unless she had a face-to-face meeting with them, and argues she was not offered

---

[8]     Notably, Plaintiff herself believed that Hren's comment and the crotch-grabbing gestures were made based on her sexual orientation, and the co-workers' threats based on her complaint about Hren.  (Pl.'s 56.1(b) ¶ 13; Carroll Deposition at 161-63.)  Plaintiff appears to acknowledge that her sex, by itself, did not motivate the misconduct; she testified that she did not believe the crotch-grabbing gesture would have been made if she were not homosexual, and that she did not see anyone make these gestures in front of any other women.  (Carroll Deposition at 162-63.)

that opportunity. (Pl.'s 56.1(b) ¶ 14.) On this record, there is no basis for a conclusion either that Plaintiff provided enough information that Merrill Lynch should have (or could have) engaged in some action without additional information from Plaintiff, or that Plaintiff's request for a face-to-face meeting had any objective justification. Merrill Lynch acted swiftly in response to every specific complaint Plaintiff made, and Plaintiff offers no evidence that it would not have done so again, had she provided specific, actionable information concerning her later allegations. To establish liability for a hostile environment, an employee has a duty to "provide the detail necessary for [the employer] to understand the nature of the harassment and to respond appropriately." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 638 (7th Cir. 2009). Plaintiff did not do so. No genuine issue of material fact exists regarding Plaintiff's hostile work environment claim.

### C. Retaliation

Plaintiff asserts that she was subject to retaliation in violation of Title VII. Though Plaintiff does not specify what actions led to what type of retaliation, the court reads her complaint as alleging that she was demoted in response to her complaints about Hren and Buttny, and that she was fired in response to those complaints and to the additional charges she made during the fall of 2005. In light of Defendant's prompt and aggressive response to Plaintiff's complaints, the notion that Defendant later penalized her for them is arguably counterintuitive; the court nevertheless proceeds to analyze this claim under both the direct and indirect methods of proof.

#### 1. Direct Method

Establishing a retaliation claim by the direct method requires that Plaintiff present direct or circumstantial evidence that she suffered an adverse employment action because she engaged in protected conduct. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). Complaints constitute protected conduct if the employee has a "reasonable, good-faith belief" that the complaint involved gender discrimination. *Id.* at 674.

Plaintiff's most articulated version of her retaliation claim is that she was relieved of her

supervisory responsibilities because of her complaints regarding Hren. The court first notes that Plaintiff has provided little evidence that her complaints concerning Hren involved protected activity. There is no allegation that her complaints about K.J., the employee she alleges made death threats against others, had anything to do with gender (nor does Plaintiff allege that *she* was threatened). Further, any inference that Hren's use of profanity, about which she complained, was based on gender is belied by Plaintiff's testimony that he said "Fuck You" to everyone in the office, that a male co-worker "got it the worst" from Hren, and that Plaintiff herself frequently used the same language in the workplace. (Carroll Deposition at 260-61.)

In any event, even assuming that Plaintiff's complaints about Hren constituted protected conduct, there is no evidence that Plaintiff suffered an adverse employment action as a result of them. Plaintiff contends that she served as supervisor in the mornings before Hren arrived, and that after the departmental restructuring Roesch stripped her of those duties. The parties agree that her official title, pay, and benefits did not change. To sufficiently allege an adverse action in the retaliation context, the action must be "materially adverse to a reasonable employee" such that it would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Pantoja v. American MTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007) (citation and quotation omitted). Roesch's unwillingness to allow Plaintiff to continue as a *de facto* attendance monitor does not meet this test.

Notably, apart from Plaintiff's own testimony, there is no evidence that she had any supervisory responsibilities. Although Roesch was evidently unaware of the "back-up" reporting arrangement prior to his meeting with Plaintiff, and although such an arrangement was inconsistent with company practice, Roesch appears to acknowledge that, in Hren's absence, Plaintiff may have informally assisted in reporting her co-workers' absences up the chain of command. (Roesch Deposition at 27.) There is no other corroboration of Plaintiff's claim that she acted as a supervisor. To the extent that Plaintiff's "supervisory duties" included offering advice to other employees,

23

Plaintiff does not allege that anything Merrill Lynch did in response to Hren and Buttny's firings in any way impeded her ability to continue doing so.

The only adverse action Plaintiff thus alleges is that she no longer dealt with attendance issues when Hren was absent or in the hours before he arrived. This does not constitute a material change sufficient to support a Title VII retaliation claim. To the extent that Plaintiff's informal responsibilities were any more extensive than this, she has failed to describe them with any specificity or provide any evidence of them, such as testimony from a co-worker who could describe those responsibilities.

If all this were not enough to doom any claim based on a purported demotion, the court notes that Plaintiff has not offered any admissible evidence that these responsibilities were taken from her because of her complaints. As noted, Roesch, who Plaintiff does not dispute made the decision to restructure after Hren and Buttny were fired, testified that he was not even aware of Plaintiff's informal responsibilities when he explained the restructuring to her, and had to ask her to explain the situation to him. Plaintiff provides nothing aside from her subjective beliefs that calls Roesch's testimony into doubt.

Plaintiff's termination itself unquestionably qualifies as an adverse action, and it is undisputed that Roesch made the decision to fire Plaintiff. (Pl.'s Resp. ¶ 66; Defs.' 56.1(a) ¶ 66.) Again, however, although Plaintiff does allege that she was fired in retaliation for her complaints, she offers no evidence in support of this allegation that could support liability under the direct method. (Pl.'s Resp. ¶ 66.) Plaintiff contends that the "shifting" explanations for her firing constitute circumstantial evidence that she was in fact fired for some reason other than her erratic behavior and threatening phone call. (Pl.'s 56.1(b) ¶ 53-54.) The only "shift" in reasons that she identifies, however, is that in some cases Merrill Lynch said that the "triggering event" for her firing was the threatening phone call, and in other cases said that the phone call and "other erratic behavior" led to the firing. (*Id.*) These immaterial differences fall far short of establishing, even circumstantially,

a causal connection between Plaintiff's complaints and her discharge. Plaintiff first lodged complaints against Hren and Buttny four months before being placed on administrative leave and six months before her termination. The timing of Plaintiff's placement on administrative leave confirms that it was in direct response to the Thanksgiving evening phone call–not to her prior complaints. Summary judgment is the "put up or shut up moment in a lawsuit," *Steen*, 486 F.3d at 1022, and Plaintiff has not put up evidence establishing retaliation under the direct method.

### 2. Indirect Method

Plaintiff's effort to establish retaliation via the indirect method fares no better. To establish a *prima facie* case of retaliation through the indirect method, Plaintiff must demonstrate that she (1) engaged in protected activity, (2) was subject to a materially adverse employment action, (3) was performing her job satisfactorily, and (4) was treated worse than a similarly situated employee who did not complain of discrimination. *Hill*, 625 F.3d at 1000-01 (citation omitted). If she can make such a showing, Defendant may present a legitimate, non-discriminatory reason for its actions, and Plaintiff can then survive summary judgment if she can show that those reasons are pretextual. *Id.* at 1001.

Any retaliation claim based on the alleged demotion fails because, as discussed previously, Plaintiff has not established a materially adverse employment action. As for her termination, first, as discussed previously, assuming that Plaintiff engaged in protected activity, she has offered no evidence that any similarly-situated employee who did not complain of discrimination was treated more favorably. Defendant has offered a legitimate, non-discriminatory reason for her discharge—the threatening telephone call—and Plaintiff offers nothing to show that the reason was pretextual, aside from her blanket and unsupported denial that the phone call was the motivation for her discharge. She offers no basis for a conclusion that any other worker who engaged in such disturbing behavior was disciplined less harshly. The court sees no dispute of material fact here and concludes that Plaintiff's retaliation claim based on the indirect method also fails.

## II.     Unpaid Wage Claims

Having disposed of all federal claims, the court has discretion to remand this case to state court for disposition of the state law claims. *Al's Service Center v. BP Products North America*, *Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). Because this case has been pending in federal court for more than four years, however, and the state law claims have been fully briefed, the court chooses to exercise its discretion to resolve the remaining claims. The court turns, first, to Plaintiff's allegations that Defendant improperly withdrew a bonus payment to which she was entitled. Plaintiff characterizes this incident as a violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115, *et seq*; a breach of contract; and a basis for *quantum meruit* recovery.

While the court will analyze these claims in further detail, they all fail for essentially the same reason. Plaintiff alleges that her firing was "improper, illegal, discriminatory and retaliatory," and that therefore she was entitled to the bonus that she alleges is paid to all employees in "good standing." (Response at 29.) The court has, however, already reviewed Plaintiff's allegations concerning her firing and found them to be lacking. Defendant terminated Plaintiff for legitimate, non-discriminatory reasons and Plaintiff was therefore not an employee in "good standing" at the time of the erroneous bonus payment. Although Merrill Lynch's withdrawal of the bonus funds after initially crediting them to Plaintiff's account was arguably ham-handed, the court concludes that none of her theories support her claim for recovery of this money.

### A.     Illinois Wage Payment and Collection Act

Plaintiff first invokes the Illinois Wage Payment and Collection Act, which provides a cause of action for an employee cheated out of his/her pay. "The purpose of the Act is to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation without retaliation from employers." *Miller v. Kiefer Specialty Flooring, Inc.*, 317 Ill. App. 3d 370, 374, 739 N.E.2d 982, 986 (2d Dist. 2000). The IWPCA provides that

"wages" shall be defined as any compensation owed an employee by an employer

pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.

820 ILCS 115/2.

Defendant argues that because Plaintiff had no contract or agreement entitling her to a bonus, she has no claim pursuant to the IWPCA. As Defendant points out, Plaintiff admitted in her deposition that no contract or agreement establishes her right to a bonus. (Defs.' Br. at 14-15 (citing Carroll Deposition at 68-69, 286, 288).) Plaintiff nevertheless challenges Defendant's assertion that her claim for a bonus is not legally enforceable, citing a portion of the Illinois Administrative Code which explains that "[a] claim for an earned bonus arises when an employee performs the requirements for a bonus set forth in a contract or an agreement between the parties." 56 Ill. Adm. Code 300.500. Moreover, as Plaintiff notes, "[a]n employment agreement need not be a formally negotiated contract." (Response at 31 (quoting *Landers-Scelfo v. Corporate Office Systems, Inc.*, 356 Ill. App. 3d 1060, 1067, 827 N.E.2d 1051, 1059 (2d Dist. 2005).) Indeed, "[a]n 'agreement' is broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an 'agreement' without the formalities and accompanying legal protections of a contract." *Zabinsky v. Gelber Group, Inc.*, 347 Ill. App. 3d 243, 249, 807 N.E.2d 666, 671 (1st Dist. 2004).

Notably, however, Plaintiff herself offers no detail at all concerning any "manifestation of mutual assent." The sole allegation in her complaint regarding her right to a bonus is that, since beginning work at Merrill Lynch in 1978, Plaintiff "received a yearly bonus each and every year for eight (8) to ten (10) years without fail." (Compl. ¶ 38.) This fact itself suggests the bonus was discretionary, as Plaintiff worked for Merrill Lynch for 25 years and evidently received a bonus at most in ten of those years. In any event, case law confirms that past practice itself is not enough

to support a wage claim. "[Plaintiff] has no employment contract setting out the terms of his bonus. He claims that past practice constitutes a contract . . . [but] what [plaintiff] is trying to do is use the employer's practice 'not to explicate a contract but to create one.'" *Stark v. PPM America, Inc.*, 354 F.3d 666, 672 (7th Cir. 2004) (citation omitted) (affirming summary judgment against plaintiff on Illinois Wage Payment and Collection Act claim).

Disappointingly, Defendant has not presented any evidence concerning its practice for awarding bonuses and has not explained whether such awards are automatic or whether it makes individualized bonus decisions. Nor has Merrill Lynch offered any explanation for its initial deposit of the bonus money into Plaintiff's account. The only mention of the "good standing" requirement in the record comes from Roesch's deposition, in which he testified that the reason Merrill Lynch did not pay her a bonus was that "[s]he was not an employee in good standing at the time the payment was made." (Roesch Deposition at 10.) Plaintiff bears the burden of proof on this issue, however, and despite ample opportunity for discovery, she also has offered no evidence concerning Defendant's bonus practices, nor any proof that any similarly-situated employees received a bonus. There is no basis in the record for the conclusion that bonuses were automatically paid to employees at any particular time, in any particular circumstances, or pursuant to any particular formula. Instead, Plaintiff herself appears to concede that she was entitled to her bonus only so long as she was in "good standing" at the time of payment. (Response at 29.) She argues that her "claims of improper, illegal, discriminatory and retaliatory termination," create a factual dispute as to whether she was in "good standing" at the time of the bonus payment. (*Id.*). For the reasons already explained, however, the court has granted summary judgment in favor of Defendant on Plaintiff's claims that her termination was unlawful. Her claim that she is entitled to a bonus pursuant to the IWPCA fails.

### B.    Breach of Contract

The second theory underlying Plaintiff's claim for the bonus is breach of contract. In support

of the contract theory, Plaintiff offers only the allegation that "Plaintiff and Defendants entered into oral and/or written employment contracts." (Compl. ¶ 132.) Plaintiff nowhere specifies the substance of any such contract, however and, as noted, acknowledged in her deposition that she had no contract or agreement with Merrill Lynch. (Defs.' Br. at 15-16 (citing Carroll Deposition at 68-69, 286, 288).)

In the employment context, contractual obligations can sometimes be found without any formalities. As explained above, however, Plaintiff offers no evidence of any policy or practice concerning bonuses that would rise to the level of an enforceable agreement. Her contract claim is dismissed.

### C. Quantum Meruit

Plaintiff next invokes quantum meruit. A claim for quantum meruit, or unjust enrichment, requires a defendant to pay a plaintiff if the defendant has received a benefit from plaintiff "which [it] is unjust for him to retain without paying for it." *Krieger v. Adler, Kaplan & Begy*, No. 94 C 7809, 1997 WL 323827, at *11 (N.D. Ill. June 11, 1997) (quoting *Paradise v. Augustana Hosp. and Health Care Ctr.*, 165 Ill. App. 3d 672, 676, 584 N.E.2d 326, 329 (1st Dist. 1991)). To prevail on a wage claim under this theory, Plaintiff must establish that she performed services, the reasonable value of the services performed, and that Defendant received the benefit of those services without paying her. *Id.* Defendant argues that Plaintiff has not offered evidence sufficient to create a genuine issue of material fact on any of these elements.

Plaintiff argues that because "the amount owed is not disputed" she is entitled to the bonus payment. But while the amount of the bonus is not disputed–$4,000–whether it is *owed* is disputed. Plaintiff sets forth nothing at all that establishes the reasonable value of the services performed nor that she was not paid for those services. Instead, she admits that she was paid all wages (aside from the discretionary bonus) owed to her. (Defs.' Br. at 16-17 (citing Carroll Deposition at 285, 289-90).) It may well be that Merrill Lynch employees reasonably understood that their pay

included a bonus, and understood, further, that the bonus was measured by hours worked or months of seniority or measured productivity. It may be that all other employees received a bonus at the same time, regardless of their disciplinary status. No such evidence appears in this record, however, and the court concludes there is no basis for quantum meruit recovery.

## III.  Tortious Interference

Plaintiff next claims tortious interference with contractual relations[9] based on an allegation that Merrill Lynch prevented her from securing a job with another trading firm (which is variously named as Chicago Trading Services, Trading Services LLC, or Flematt, which may or may not be the same company). With nothing other than hearsay to support her assertion, Plaintiff contends that an "unknown" individual from Merrill Lynch told someone at this firm (or one of these firms) that she was "bad news" and to "steer clear of her." (Compl. ¶¶ 75-85.)

Under Illinois law, tortious interference with contractual relations requires: "(1) the existence of a contract; (2) the defendants' awareness of the contract; (2) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005). Plaintiff has not established even one of these elements. The sole evidence she offers are e-mails between herself and her attorney, or between her attorney and Merrill Lynch officials, discussing Plaintiff's reports of a job offer. These e-mails contain no admissible evidence of any position purportedly offered to Plaintiff, and in fact contain three different names for the company that purportedly offered her a position. Absent any admissible

---

[9]        The court notes that Plaintiff's claim might be better styled as one for tortious interference with a prospective business relationship. Such a claim requires a showing of "(1) plaintiff's reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of that expectancy; (3) defendant's intentional and unjustifiable interference that induced or caused a breach or termination of the expectancy; and (4) damage to plaintiff resulting from defendant's conduct." *Kikson v. Underwriters Laboratories, Inc.*, 492 F.3d 794, 800 (7th Cir. 2007). Even under this theory (which Plaintiff has not invoked), however, Plaintiff's claim fails because she has not offered anything aside from her own hearsay testimony that she had a "reasonable expectancy of entering into a valid business relationship." The actual name of the prospective employer is not even in the record.

evidence of any contract, Defendant is entitled to summary judgment on this claim, as well.

## IV.    Eavesdropping

Plaintiff's claims for eavesdropping in violation of Illinois law involve Patricia Kelliher's recording of Plaintiff's Thanksgiving evening phone call, Jim Kelliher's subsequent re-recording of the call, and his playback of the call for Merrill Lynch executives.

Illinois law prohibits recording a telephone conversation without the consent of all parties and also bars the use or disclosure of "information which [a person] knows or reasonably should know was obtained through the use of an eavesdropping device."  720 ILCS 5/14-2(a)(1), (3).

The law creates an exemption for the

(i) Recording of a conversation made by or at the request of a person, not a law enforcement officer or agent of a law enforcement officer, who is a party to the conversation, under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense against the person or a member of his or her immediate household, and there is reason to believe that evidence of the criminal offense may be obtained by the recording.

720 ILCS 5/14-3(i).  During debate on this exemption, Senator Kirk Dillard explained that "if a stalking victim has someone call them up on the telephone, they can clearly record that to help them in the prosecution of that crime against them, if they believe that the recording will help them obtain evidence that can be used to–to prevent offenses."  1996 Ill. Atty. Gen. Op. 036 (quoting Remarks of Sen. Dillard, April 21, 1994, Senate Debate on S.B. No. 1352, at 139-40).

### A.    Patricia Kelliher's Recording of the Phone Call

Patricia Kelliher testified that she pressed the button on her answering machine to record the conversation because she feared for the safety of herself and her family.  She testified, in part,

The whole conversation of what I was hearing and what was going on was very disturbing to me.  It was very upsetting to me, and I wanted it to be done.  I wanted it to be over.  I wanted him to get off the phone and tell me who this person was and why is she calling and do we need to contact somebody because I'm freaked out by this. . . . All I could say is that I was scared, that when people are erratic and not making sense and are yelling and are upsetting me and my husband can't give me an explanation, something could very possibly occur.  Specifically what crime?  Any number of things.  I don't know how people act.  You know, I don't know what their

31

capacity is if I don't know who they are. And I did not know who Mary was or her capacity that night.

(Patricia Kelliher Deposition, Ex. B to Defs.' 56.1(a) at 49, 60-61.) Plaintiff agreed that during the call she acted "inappropriately," and that she was enraged and irrational. (Carroll Deposition at 190.)

The § 5/14-3(i) exception has been examined in just a handful of Illinois state or federal cases. For example, a court in this district granted summary judgment to defendants on a state-law eavesdropping claim where plaintiff had previously made several phone calls to his ex-wife that involved "yelling and swearing," and had made death threats in other calls. *McWilliams v. McWilliams*, No. 06 C 3060, 2007 WL 1141613, at *1 (N.D. Ill. April 16, 2007). The ex-wife and her friend recorded calls in which plaintiff made additional threats, and during one of them, the ex-wife and her friend contacted police. *Id.* at *2. The court concluded that the "repeated threats and aggression are undeniable" and entered summary judgment for the defendant on the basis of the exemption related to criminal offenses. *Id.* at *8.

Plaintiff argues that the exemption does not apply here because Patricia Kelliher did not actually believe a crime was being committed, and that she instead recorded the call out of fear for her husband's job, or as part of a scheme to get Plaintiff fired. The court disagrees. The exemption to the eavesdropping statute does not require actual knowledge that a specific crime is being committed, but instead permits recording where there is "reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense against the person or a member of his or her immediate household." 720 ILCS 5/14-3(i). This exemption would be virtually meaningless if it required certainty–in such a case the recording itself would likely be superfluous as the person who makes the recording might well be able to establish the crime without the telephone call. "Reasonable suspicion" requires, by definition, that the individual have a suspicion–a subjective requirement–and that the individual's suspicion be objectively reasonable.

*Glinski v. City of Chicago*, No. 99 C 3063, 2002 WL 113884, at *8 (N.D. Ill. Jan. 29, 2002) (examining the exemption for purposes of determining whether evidence gathered from allegedly illegal eavesdropping should be admissible).

Patricia Kelliher's stated reasons for recording the call related to criminal activity, even if not to a specific crime. Illinois law does, for example, criminalize telephone harassment: It is illegal to make a telephone call "with intent to abuse, threaten or harass any person at the called number." 720 ILCS 135/1-1(2). Whether or not Plaintiff violated this law is immaterial; the undisputed facts and Plaintiff's own testimony as to her state of mind during the call show that Patricia Kelliher had an objectively reasonable suspicion that some crime was being committed.

Plaintiff cites to *Cox v. Bigler*, No. 04-4019-JLF, 2006 WL 2632066 (S.D. Ill. Sept. 12, 2006), to argue that the exemption should not apply to the Kellihers because they baited her into making threats. In *Cox*, the court concluded that "a reasonable suspicion of criminal activity must exist prior to the tape recording and cannot be simply manufactured contemporaneously with the recording." *Id.* at *8. In that case, a lawyer for a client charged with sexual molestation asked a third party to record a phone call with the victim. When the first call failed to elicit the desired recantation, the lawyer directed the third party to call the victim again and ask for the victim's help in fabricating charges. *Id.* at *1. The court concluded that reasonable suspicion did not exist because the caller "had no idea" whether the victim would make a false accusation until the caller "planted the idea in her mind." *Id.* at *8. These circumstances bear no resemblance to Patricia Kelliher's spontaneous decision to record a call she found threatening. Patricia Kelliher did not stop the conversation or attempt to elicit any statements. Her unrebutted testimony is that her fear, and thereby "reasonable suspicion," existed at the time she pressed the record button, already about ten minutes into the conversation.

Plaintiff's argument that the Kellihers somehow baited her into making inappropriate statements is premised on her "two calls" theory, but that theory is plainly contradicted by Plaintiff's

phone bill, by Plaintiff's own statements within her 56.1(b) submission, and by the fact that it was Plaintiff who called the Kellihers. As best the court can understand her argument, Plaintiff appears to believe that because loss of her husband's employment was among Patricia Kelliher's fears, she could not also have feared commission of a crime: "The 'fear' for employment action echoed in the police reports filed by the Kellihers . . . demonstrates that the true intent and purpose of the recording to cause Plaintiff to loose (sic) her husband's job not 'fear of crime.'" (Response at 36.) Plaintiff's own hunches about a conspiracy are clearly insufficient to survive summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). The court is satisfied that Patricia Kelliher had "reasonable suspicion" that a crime was imminent or in progress when she recorded the conversation, and therefore grants Defendants' motion for summary judgment on this claim.

### B.    Subsequent Distribution of the Recording

Plaintiff alleges that Jim Kelliher violated the eavesdropping law when he recorded the phone call from the answering machine onto a tape recorder and subsequently played the recording for the police and Merrill Lynch executives, and that Merrill Lynch violated the eavesdropping law in requesting and listening to the playback of the recording. Defendants argue that because the recording is exempt from the eavesdropping law, the subsequent recording and playback are also exempt. Specifically, if the recording falls into an exemption, Defendants argue, any subsequent use of that recording falls outside the scope of the law. Indeed, the statute explains, before listing the exemptions, that "[t]he following activities shall be exempt from the provisions of this Article." 720 ILCS 5/14-3. Having found that the recording is exempt, the court finds no authority, and Plaintiff provides none, that would penalize subsequent distribution or broadcast. Defendants will be granted summary judgment on the eavesdropping claims against Jim Kelliher and Merrill Lynch.

### V.    Intrusion upon Seclusion

Plaintiff has also challenged the recording of her telephone call under tort theories. Thus, she argues that the recording constitutes "intrusion upon seclusion." Defendants argue this claim

fails for a number of reasons, including that Plaintiff herself called the Kellihers, and that she later publicized the contents of the conversation, vitiating any privacy expectations she claims to have had in the conversation.

According to the Restatement of Torts,

> one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns is subject to liability to the other for the invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Rest. (2d) Torts § 652B.  The Seventh Circuit has explained that, "A person who wants to stop solicitors from ringing his doorbell and peddling vacuum cleaners at 9 p.m. asserts a claim to privacy in the sense of seclusion." *Am. States Ins. Co. v. Capital Assocs. of Jackson County, Inc.*, 392 F.3d 939, 941 (7th Cir. 2004).  The court notes that the Illinois Supreme Court has not recognized intrusion upon seclusion as a viable cause of action within the state.  *Lovgren v. Citizens First Nat'l Bank of Princeton*, 126 Ill. 2d 411, 417, 534 N.E.2d 987, 989 (1989).  The Court did, however, note that "the contours of the tort of unreasonable intrusion into the seclusion of another are intuitive to a degree," and that examples include, "invading someone's home; an illegal search of someone's shopping bag in a store; eavesdropping by wiretapping; peering into the windows of a private home; and persistent and unwanted telephone calls." *Id.*

Defendants' actions here fall far outside the bounds of this tort.  (Arguably, Plaintiff's own actions are a much better fit.)  First, the Kellihers did not intentionally intrude upon anything.  It is undisputed that it was Plaintiff who called them, in their home, at 9 p.m., on Thanksgiving Day. Equally important, the undisputed facts demonstrate that Plaintiff had no reasonable expectation of privacy in the contents of the conversation.  In fact, she discussed the incident with other employees and posted the details of it on the Internet.  (Carroll 12/2010 Deposition at 192-97, 199, 266-67, 296-97.)  Two prerequisites of an intrusion upon seclusion claim are an allegation that the prying included "private facts," such as details of a person's financial, medical or sexual life, and

that the Plaintiff has "attempted to keep private facts private." *Acosta v. Scott Labor LLC*, 377 F. Supp. 2d 647, 650 (N.D. Ill. 2005). Neither is satisfied here: Plaintiff fails to allege a single private fact that she believes was compromised, and she admits to openly disclosing details of the conversation to the public. Furthermore, she had no reason to believe that her communication with Kelliher should have remained private–the record contains no evidence she requested that he keep the call private nor that he assured her he would do so.

Plaintiff has not offered evidence supporting any element of this tort, and the undisputed facts put the Kellihers' behavior far outside the realm of liability.

## VI.     Intentional Infliction of Emotional Distress

Finally, Plaintiff claims that the Kellihers and Merrill Lynch are liable for the intentional infliction of emotional distress due to the recorded phone call that she claims led to her subsequent firing. To establish a claim of intentional infliction of emotional distress, a plaintiff must show that (1) the conduct at issue was extreme and outrageous, (2) the actor either intended that conduct to cause severe emotional distress or knew there was a high probability that it would do so, and (3) that the conduct in fact caused severe emotional distress. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 702 (7th Cir. 1993) (citation omitted). The behavior at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 766, 66 Ill. 2d 85, 90 (1976) (citation and quotation omitted).

None of these factors is established here. The court can begin and end by observing that Plaintiff has presented no evidence that anyone intended to cause her emotional distress. She contends that the "actions were intentional" in that Patricia Kelliher intentionally pressed the record button, and asserts that Jim Kelliher played it for managers at Merrill Lynch, "knowing it would cause Plaintiff's termination," but even if this is true, the tort of IIED requires more—Defendants must not only have intended their actions, but intended that those actions *cause emotional distress.*

Plaintiff does not allege this, and the record does not support it.  Defendant is entitled to summary judgment on Plaintiff's IIED claim.

## <u>CONCLUSION</u>

For the reasons discussed herein, Defendants' motion for summary judgment [126] is granted in full.  Defendants' motions to strike [150, 152, 154] are denied as moot.

ENTER:

Dated:        May 13, 2011

_____
REBECCA R. PALLMEYER
United States District Judge