UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY CARROLL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 07 C 1575 |
| MERRILL LYNCH, and JIM KELLIHER, PATRICIA KELLIHER | ) ) Judge Rebecca Pallmeyer ) ) |
| Defendants. | ) ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Mary Carroll, a former employee of Merrill Lynch, sued her employer, a co-worker, and the co-worker's wife, alleging a host of federal and state law claims. This court granted summary judgment in favor of Defendants on all of those claims, including sex discrimination, hostile work environment, and retaliation, in violation of Title VII; breach of contract; violation of the Illinois Wage and Payment Collection Act; quantum meruit; tortious interference; violation of the Illinois Eavesdropping Act; intrusion upon seclusion; and intentional infliction of emotional distress. *Carroll v. Merrill Lynch*, No. 07 C 1575, 2011 WL 1838563 (N.D. Ill. May 13, 2011). Carroll now seeks reconsideration of that ruling on certain claims. She argues that the court erred in dismissing her claims under the Illinois Eavesdropping Act against her co-worker and his wife, Jim and Patricia Kelliher, and that she did not have an opportunity to address Merrill Lynch's arguments for summary judgment on her sex discrimination claim. She has also asked the court to revisit its judgment on her retaliation claim.

On July 11, 2011, the court denied the motion to reconsider with respect to the Illinois Eavesdropping Act claims, because Carroll had fully briefed the issues relating to that claim, in which she alleged that her co-worker and his wife violated the law by recording a harassing phone call that Carroll admits she made. Nothing in Carroll's motion for reconsideration alters the court's earlier analysis of that claim. Moreover, as the court observed at a hearing on this motion, there

is no evidence that Carroll suffered any damage as a result of *the recording* of the harassing phone call. It was the harassing call itself that led to her discharge.

The court agreed with Carroll, however, that because Merrill Lynch had addressed her Title VII sex discrimination claim only in a footnote in its reply brief, Carroll did not have an opportunity to respond to Merrill Lynch's arguments on that claim.[1] The court, therefore, has allowed additional briefing on Carroll's claim that Merrill Lynch discriminated against her on the basis of sex and retaliated against her by stripping her of certain supervisory duties, failing to respond to her complaints, and ultimately terminating her. (Plaintiff's Supplemental Response Memorandum in Opposition to Defendant's Motion for Summary Judgment on Title VII Claims (hereinafter "Pl.'s Supplemental Resp. Mem.") [194], at 3-4.)[2]

**BACKGROUND**

The court's previous opinion presents the facts at length, but it briefly reviews them here, again in the light most favorable to Carroll. Until 2006, Carroll worked as a trade balancer in the Clearing Services department at Merrill Lynch in Chicago. (Defs.' 56.1 [128] ¶ 2.) Carroll claims she also had certain supervisory duties, pursuant to which she acted as an unofficial "lead checker" in the absence of her supervisor, Doug Hren. (Carroll Dep., Ex. A to Evidentiary Submission in Supp. of Defs.' Mot. for Complete Summ. J. (hereinafter "Defs.' 56.1 Supp.") [129], at 119:6-120:4.) Those duties related mostly to monitoring the attendance of others in the department, but Hren issued performance evaluations in which he stated, "I have complete confidence in Mary's ability to manage the tradechecking department when I need help or am not available." (Overall Performance Summaries, Exs. 10 and 11 to Pl.'s [Mot.] for Leave to File Supplemental/Additional

---

[1] Merrill Lynch's opening brief addressed the issue on which Carroll had focused in discovery: a claim of discrimination on the basis of her sexual orientation.

[2] Carroll has not challenged the dismissal of her failure-to-promote claim or her hostile work environment claim. (Pl.'s Supplemental Resp. Mem. at 4.)

Facts in Supp. of Her Resp. to Mot. for Summ. J. (hereinafter "Pl.'s Mot. for Leave to File Add'l Facts") [192].)

At some point in 2004, K.J., a male co-worker also under Hren's supervision, made death threats against other employees. (Pl.'s Supplemental [sic] Statement of Additional Facts (hereinafter "Pl.'s Add'l Facts") [192-2] ¶¶ 1, 3.) Merrill Lynch management directed Jim Kelliher, a trading floor supervisor and a "buddy" of K.J.'s, to informally investigate the threats. (Pl.'s Add'l Facts ¶ 4.) In response to Kelliher's questions, K.J. said he was not serious about the threats. (*Id.* ¶ 4.) Still concerned, Carroll spoke with Hren's supervisor, Lou Buttny, about the threats, but Buttny brushed them off as "gossip." (*Id.* ¶ 5.) Merrill Lynch nevertheless terminated K.J. one month later, although in July 2005, Hren reportedly considered re-hiring him. (*Id.* ¶¶ 2, 6.) Carroll called Buttny's supervisor, Frank Catris, to express her concern about K.J.'s possible re-hiring. (*Id.* ¶ 7.) After this call, Hren confronted Carroll, called her a "whistleblower," said "f--- you," and told her, "Go home and wash your dick." (*Id.* ¶ 8.)

Carroll complained about these remarks to Merrill Lynch's Employee Service Center. (Defs.' 56.1 ¶ 10.) Joanne Gonzalez, an employee relations representative, took prompt action: she investigated the matter and reported it to management, including to Walter Roesch, Vice President of Clearing Services for Merrill Lynch. (*Id.* ¶¶ 10, 11.) On August 25, 2005, Roesch fired Hren for his remarks and Buttny for failing to address Hren's behavior. (*Id.* ¶¶ 12, 13.) Roesch then convened a meeting of the Clearing Services department in which he announced the firings and warned employees that retaliation would not be tolerated. (*Id.* ¶ 14.)

Following Hren and Buttny's termination, Roesch restructured the Clearing Services department, assigning a woman named Liz Creek to replace Buttny and to absorb Hren's duties. (Carroll Dep. at 97:16-98:2.) Roesch met personally with Carroll to explain the changes in the department. (Defs.' 56.1 ¶ 23.) In that meeting, Carroll told Roesch that she had been Hren's "back-up" in his absence. (*Id.* at ¶ 24.) This was news to Roesch, and he told Carroll that her back-

3

up role would no longer be necessary. (Roesch Dep., Ex. D to Def.'s 56.1, 27:11-28:4.) He testified at his deposition that Carroll explained "that she was Doug's back-up, and as Doug's back-up, if he wasn't in and other people needed to call in, they were going to be out, or whatever, [they] called her instead, and I told her that was no longer going to be necessary." (*Id.* at 138:15-19.)

It is undisputed that there was no change to Carroll's official job title, salary, or benefits, as a result of Hren's termination or Carroll's relief from her role as Hren's back-up. (Defs.' 56.1 ¶ 26.) Carroll nevertheless characterizes this event as a demotion. (Pl.'s Second Summ. J. Aff. Related to Title VII Complaints, Demotion and Supervisory Work Duties (hereinafter "Pl.'s Second Aff."), Ex. 5 to Pl.'s Mot. for Leave to File Add'l Facts, ¶ 11.) She asserts, without any evidence, that the removal of these duties reduced her chances for future promotion and increased income. (*Id.* ¶¶ 14-17.)

After Hren's termination, Carroll received threats from co-workers who said they would "kick her ass" and "kick her teeth down her throat." (Pl.'s Add'l Facts ¶ 24.) Carroll also claims that several men, unidentified in the record, looked at her and placed their hands on their crotches. (Defs.' 56.1 ¶ 29.) Carroll called Joanne Gonzalez to complain about these incidents, but refused to identify the employees involved because she believed that Gonzalez had breached a promise of confidentiality Gonzalez had made in connection with Carroll's complaints about Hren. (*Id.* ¶¶ 29, 30; Pl.'s Resp. to Defs.' 56.1 (hereinafter "Pl.'s Resp.") [146] ¶ 30.) Carroll insists she was in fact willing to provide the names of the employees, but only in a face-to-face meeting with Gonzalez or Roesch, both of whom work primarily New Jersey. (Pl.'s Resp. ¶ 30.) She also claims, without any evidence, that Walter Roesch was in Chicago and was aware of the threats, but never met with her. (Pl.'s Add'l Facts ¶ 26.) Carroll also claims that Jeanne Gonzalez and Bill Bubb, a Merrill Lynch attorney, promised to fly to Chicago for this face-to-face meeting, but never fulfilled that promise.[3]

---

[3] Gonzalez's account is different. She claims, "We attempted to go to Chicago. The
(continued...)

(*Id.* ¶ 25.) In any case, Liz Creek and another new supervisor, Jim Halm, held meetings with their staffs and warned that Merrill Lynch would not tolerate harassment. (Defs.' 56.1 ¶ 32.)

On October 21, 2005, Carroll complained to her new immediate supervisor, Karen Klatt, that people on the eleventh floor were not answering her phone calls. (Defs.' 56.1 ¶ 41.) Liz Creek investigated this complaint, and the worker she interviewed assured her that he was in fact picking up all incoming calls. (10/22/2005 E-mail from Liz Creek to Walter Roesch, Ex. 9 to Pl.'s 56.1.)

At some point during this same time period, Carroll asked Jim Kelliher about his job duties. (Defs.' 56.1 ¶ 45.) When Kelliher explained that he supervised trading floor activities and trade checkers, Carroll concluded that Kelliher had assumed the responsibilities she had under Hren. (*Id.* ¶ 46.) In response, as the court has previously described at length, *see Carroll*, 2011 WL 1838563, at *6-7, Carroll called Jim Kelliher at home on Thanksgiving evening, November 24, 2005. She later admitted she was "all riled up" and "angry" (Carroll Dep. 175:7-13), and that she "just f---ing snapped." (*Id.* 200:15-201:12.) When Patricia Kelliher, Jim's wife, overheard Carroll's agitated voice on the phone, she felt threatened, and, anticipating a report to the police, recorded a portion of the call on the family's home answering machine. (Defs.' 56.1 ¶¶ 50, 51.) Jim Kelliher later advised his supervisor about the call, and, after Liz Creek and Walter Roesch listened to the recording, Roesch placed Carroll on administrative leave, officially terminating her on February 9, 2006. (Defs.' 56.1 ¶¶ 59-60, 68, 72.)

## DISCUSSION

The court has reviewed the standards governing summary judgment in its earlier opinion, and turns directly to analysis of Carroll's sex discrimination and retaliation claims.

---

[3] (...continued)
meeting never materialized. Mary's counsel said that she didn't want to meet with us." (Gonzalez Dep., Ex. 5 to Pl.'s 56.1 [138], 87:12-14.)

**I.      Sex Discrimination**

Carroll claims that Merrill Lynch discriminated against her on the basis of sex in violation of Title VII when it (1) stripped her of supervisory duties and (2) terminated her employment. (Pl.'s Supplemental Resp. Mem. at 3-4.) After reconsideration, the court finds Defendants are entitled to summary judgment on all sex discrimination claims for the reasons explained below.

**A.      Removal of Supervisory Duties**

Carroll claims, first, that Merrill Lynch discriminated against her when Walter Roesch relieved her of any supervisory duties she had as Hren's back-up. Assuming that Roesch's decision was an "adverse employment action" at all, however, Carroll has offered no evidence under the "direct method" of proof that the decision was motivated by animus against her sex. *Cf. Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007); *Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744, 750 n.3 (7th Cir. 2006) (citations omitted). She points to no direct or circumstantial evidence of such animus; even now she states that, at the time of her meeting with Roesch, she accused him of a different unlawful motivation—that she was demoted in "retaliation for her complaints." (Pl.'s Supplemental Resp. Mem. at 2.) Roesch says he was unaware of Hren's practice of delegating responsibilities to Carroll and saw no need to continue the practice: "I explained to her we would no longer be doing it that way, Merrill's organization didn't work that way. Her job as a balancer was going to stay the way it was, but as far as being a back-up for Doug, it [sic] wasn't going to be a back-up needed for Doug." (Roesch Dep. at 27:23-28:2.)

Nor has Carroll presented evidence sufficient to establish a prima facie case under the "indirect method" of proof. *See generally Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). As a woman, Carroll can claim membership in a protected class, and her satisfactory job performance has not been genuinely disputed. As explained in the court's earlier decision, however, Carroll has not established that the alleged demotion constitutes an adverse employment action—that is, an action

6

defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 n. 1 (7th Cir. 2004) (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (internal quotation marks omitted); *see also Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000). "[O]nly a 'severe or pervasive' change in the daily 'conditions' of employment may be treated as discriminatory." *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660-661 (7th Cir. 2005) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)); *see also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). A "mere inconvenience or an alteration of job responsibilities" does not suffice. *Crady v. Liberty Nat'l Bank and Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993).[4]

Even if Roesch's decision to remove any back-up responsibilities could be understood as an adverse action, Carroll's "indirect evidence" case would fail because she has not identified any similarly situated male employee who was treated more favorably. She now contends that three other employees continued to be "lead checkers" and were not "demoted," but cites only to her own testimony in support. (Pl.'s Supplemental Resp. Mem. ¶ 21.) Walter Roesch testified to the contrary:

> Q. So are you aware of anyone without a supervisory or management title following Doug [Hren]'s termination who continued to be responsible for attendance or other issues with respect to other co-workers?

---

[4] The evidence that Plaintiff exercised any significant supervisory responsibilities is slim. She testified that she monitored her co-workers' attendance and acted as Hren's back-up when he was not around. Hren acknowledged this contribution in two performance reviews, stating, "Mary has demonstrated an ability to supervise the AM Dept when I am out of the office," "Mary understands what skills are necessary to supervise the AM Tradechecking Dept, and continues improving her interpersonal skills with clients and colleagues," and "I have complete confidence in Mary's ability to manage the tradechecking department when I need help or am not available." (Overall Performance Summaries, Exs. 10 and 11 to Pl.'s Mot. for Leave to File Add'l Facts [192].) Hren's confidence in Carroll's supervisory abilities and his apparent willingness to delegate his own duties, however, are not proof that Carroll held any formal supervisory role. The simple fact that Roesch was unaware of the practice defeats the notion that Roesch was acting out of discriminatory animus when he put a halt to it.

. . .

    A.    Not in my organization.

(Roesch Dep. at 140:16-22.) As vice-president of clearing services, Roesch is presumably in a better position to testify regarding organizational structure than Carroll, who has offered no foundation for her conclusion that these other employees continued to perform the same unofficial functions. More importantly, as noted, Roesch himself was unaware of the alleged practice of assigning "back-up" supervisory responsibilities to subordinates. His decision to strip Carroll of those responsibilities cannot be a product of discrimination unless he was aware that male co-workers had such responsibilities and allowed those male co-workers to continue performing them.

After Roesch terminated Hren and Buttny, Merrill Lynch restructured the office, assigning a woman named Liz Creek to replace them. Carroll makes much of an alleged statement by Jeanne Gonzalez that removing Carroll's alleged supervisory duties served the goal of consistency with Merrill Lynch's New Jersey office (Pl.'s Supplemental Resp. Mem. at 2), but nothing about that statement is inconsistent with Roesch's assertion that, amid a department-wide restructuring, he determined there was no need for back-up supervisory assistance. Nor does Gonzalez's statement suggest discrimination was afoot. There is, in short, no basis in direct or indirect evidence for a finding that any "demotion" Carroll complains of was a product of sex discrimination. The sex discrimination claim based on this "demotion" is dismissed.

    **B.    Termination**

Carroll's termination claim fares no better. Termination is undoubtedly an adverse employment action, but Carroll presents no evidence that the decision, made in the aftermath of the disturbing phone call Carroll made on Thanksgiving Day to Jim Kelliher, had anything to do with her sex. Carroll cites *Goodwin v. Board of Trustees of the University of Illinois*, 442 F.3d 611, 619 (7th Cir. 2006), where the Seventh Circuit observed that an employer may not rely on the incident precipitating an employee's discharge to defeat her showing of satisfactory work performance.

8

Plaintiff in that case, however, offered evidence that the pre-termination incident—involving an inappropriate e-mail message and an alleged threat—was a pretext. By contrast, Carroll has not denied making the harassing phone call or established that the incident was used as a pretext for her discriminatory termination. She does suggest that male co-workers who committed similar offenses were treated more favorably, comparing herself to two employees: K.J., the employee who allegedly made death threats against other Merrill Lynch employees, and Jim Kelliher. Carroll asserts that K.J. "was allowed to remain on the same job site, working with the very people he threatened to kill for another 30+ days, AFTER he made death threats." (Pl.'s Supplemental Resp. Mem. at 4.) Merrill Lynch notes that Carroll has offered no admissible evidence in support of this assertion (Def. Merrill Lynch's Supplemental Reply Mem. in Supp. of Complete Summ. J. (hereinafter "Def. Supplemental Reply" at 4-5)), but in the court's view it makes little difference. K.J. and Carroll were ultimately treated the same way: both were terminated. Indeed, after the phone call, Carroll continued on Merrill Lynch's payroll, albeit on administrative leave, for more than twice as long as K.J. did after making the threats. (Def. Supplemental Mem. at 6 n. 8.) The fact that K.J. was investigated by his "buddy," Jim Kelliher, and that Doug Hren allegedly considered rehiring K.J. before Hren, too, was fired, does not show that Roesch's decision to terminate Carroll was improperly motivated.

Even more difficult to comprehend is Carroll's comparison of herself to Jim Kelliher; nothing Kelliher did remotely compares to Carroll's threatening phone call. Still, Carroll complains that Kelliher's complaints about that phone call were met with "great deference and rapid response" while her own complaints were "ignored or given cursory review." (Pl.'s Supplemental Resp. Mem. at 5.) If Carroll were correct about the different response to her complaints (as explained below, she is not), it might establish a claim of discrimination in the terms and conditions of employment; it would not establish that Carroll's termination resulted from sex discrimination. As the court explained in its earlier opinion, Merrill Lynch rests its termination decision on the harassing phone

9

call that Carroll made to Jim Kelliher's house. Carroll herself admits that "Plaintiff was terminated because of call, NOT anything else." (Statement of Pl.'s Additional Facts [139] ¶ 50.) Because Carroll has not established that Merrill Lynch used the phone call incident as a pretext for sex discrimination, her claim arising out of the termination is dismissed.

## II.    Retaliation

An employer may not retaliate against an employee who has "opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). Carroll alleges that Merrill Lynch retaliated against her in three different ways: (1) by removing her supervisory job duties; (2) by failing to respond to other complaints she made after Hren and Buttny were terminated; and (3) by firing her. (Pl.'s Supplemental Resp. Mem. at 3-4.) The court addressed these claims in its earlier decision and stands by that analysis for the reasons below.

### A.    Removal of Supervisory Duties

Carroll's contention that the removal of her supervisory duties was in retaliation for her complaints about Hren is, as noted earlier, counterintuitive, given that Merrill Lynch promptly fired both Hren and his supervisor based on Carroll's complaints. Still, Carroll can establish a claim of retaliation by offering "sufficient direct or circumstantial evidence to establish (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the two." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). The direct method does not require an admission of discriminatory intent; Carroll can also proceed by presenting "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook Cnty*, 463 F.3d 773, 779 (7th Cir. 2006) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)) (internal quotation marks omitted).

Carroll offers no evidence that supports such an inference. She notes only the timing of her alleged demotion, which occurred immediately after Hren and Buttny were fired (Pl.'s Supplemental

Resp. Mem. at 11), and quotes *Phelan*, 463 F.3d 773, 781, in support of her assertion that the "suspicious timing" of the demotion establishes an inference of discriminatory intent. *Id.* (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005)). Nothing about the timing of Carroll's alleged demotion is suspicious, however. Walter Roesch eliminated Carroll's supervisory duties as part of department-wide restructuring which took place only because he had fired Hren and Buttny in response to Carroll's own complaints. Relieving Carroll of her "back-up" duties corresponded with the firing of the supervisor she backed up.

Nor is Carroll's retaliation claim viable under the indirect method of proof, which requires a showing that "(1) she engaged in a statutorily protected activity, (2) [Merrill Lynch] took a materially adverse action against her, (3) she was performing her job satisfactorily, and (4) she was treated worse than a similarly situated employee who did not complain of discrimination." *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010) (citation omitted). The materially adverse action need not happen at the workplace, but it must be "materially adverse to a reasonable employee," meaning that it would "dissuade [ ] a reasonable worker from making or supporting a charge of discrimination." *Pantoja v. Am. MTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007) (alteration in original) (quoting *Burlington N. & Santa Fe Ry.*, 548 U.S. 53, 57 (2006); *see also Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007). A change in job responsibilities can constitute a materially adverse action, depending "on how much of a change, and how disadvantageous a change, took place." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003). The record does not establish that any change in Carroll's job duties was disadvantageous at all. In any event, she has not identified any similarly situated employee, in this case any another lead checker, who did not complain about discrimination but was treated more favorably. And Merrill Lynch has offered a legitimate, non-discriminatory reason for removing Carroll's supervisory duties: the restructuring of the department after Hren and Buttny's termination. Carroll has failed to show that she was demoted in retaliation for her complaints.

### B. Failure to Respond to Carroll's Other Complaints

Carroll also alleges that Merrill Lynch failed to respond to other complaints that she made concerning threatening comments by two co-workers and offensive gestures by unidentified men who placed their hands on their crotches in her presence. She contends, further, that Merrill Lynch failed to perform an adequate investigation after she complained that certain co-workers were intentionally ignoring her phone calls. (Pl.'s Supplemental Resp. Mem. at 10.)

Failure to investigate can be the proper subject of a discrimination claim. *See, e.g.*, *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086-87 (7th Cir. 2000). The evidence is insufficient to support a claim of retaliation here, however. Merrill Lynch's alleged failure to thoroughly investigate unanswered phone calls does not constitute an adverse employment action, and is instead the sort of minor workplace dispute that "do[es] not justify trundling out the heavy artillery of federal antidiscrimination law." *Herrnreiter v. Chicago Hous. Auth.,* 315 F.3d 742, 745 (7th Cir. 2002). As to the verbal threats and offensive gestures, if Merrill Lynch's follow-up was lacking, it was only because Carroll refused to reveal the identities of her harassers.

Moreover, Carroll has not shown that any alleged failure by Merrill Lynch to investigate these complaints had any relation to her initial complaints against Hren. Perhaps recognizing this fact, Carroll's supplemental brief suggests that Merrill Lynch's conduct constitutes discrimination through a "longer chain of inferences." (Pl.'s Supplemental Resp. Mem. at 12) (citing *Luks v. Baxter Healthcare Corp.* 467 F.3d 1049, 1052 (7th Cir. 2006)) (age discrimination case). It is undisputed here, however, that Merrill Lynch promptly investigated Plaintiff's complaints against Hren and took swift and decisive action, firing both Hren and his supervisor. Merrill Lynch was unable to investigate Carroll's subsequent complaints because she refused to reveal the identities of the wrongdoers. Thus, no "chain of inferences" links any purportedly inadequate investigation to retaliation on Merrill Lynch's behalf.

Nor has Carroll identified a similarly situated employee who did not complain of

discrimination and was more favorably treated. A similarly situated employee is one who worked with the same supervisor under the same standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [her] conduct or the employer's treatment of [her]." *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). Carroll argues that Jim Kelliher is similarly situated and, as noted earlier, claims that his complaint received more attention than hers. (Pl.'s Supplemental Resp. Mem. at 5.) But Carroll's complaints were not ignored; Jim Halm and Liz Creek both convened staff meetings in which they explained that harassment would not be tolerated, and Merrill Lynch was willing to take further action once Carroll revealed the names of her harrassers.[5] Unlike Carroll, Kelliher provided Merrill Lynch with a complete complaint, which included the name of the problem employee and evidence of the inappropriate conduct (the recording), thereby enabling the company to thoroughly address his concerns. Carroll has failed to show that Merrill Lynch ignored or dismissed her other complaints in retaliation for having filed previous grievances.

**C.     Termination**

Finally, Carroll alleges that she was terminated in retaliation for the complaints she made about Hren. The court addressed this claim in its earlier ruling, *see* 2011 WL 1838563 at *15, and Plaintiff has offered no new facts that alter the conclusion that she was fired because of the harassing phone call, not because she complained of discrimination. She again suggests that K.J.

---

[5]     In an October 21, 2005 e-mail from Bubb to Carroll's attorney, Bubb wrote:

> [I]f we know the identity of the individuals who Mary says have engaged in [threatening] behavior, we can contact them, let them know about the allegations and that we are investigating them, and warn them under the threat of discharge not to engage in such activity. . . If Mary decides not to do that, I feel we must nevertheless look into her complaints because of their nature, so we cannot honor her request that we do nothing.

(10/21/2005 E-mail, Ex. 8 to Pl.'s 56.1 [138].)

and Jim Kelliher were similarly situated employees treated more favorably, but, as explained earlier, these comparisons are unavailing. Like Carroll, K.J. was also terminated, and nothing that Jim Kelliher did bears any resemblance to Carroll's inappropriate conduct. Finally, Carroll cites her "20 plus years of unblemished work followed by her rapid decline after complaint," (Pl.'s Supplemental Resp. Mem. at 15), as evidence that her termination was retaliatory. In certain circumstances, a positive employment record followed by adverse action in the wake of a complaint may support a showing of retaliation. *See, e.g.*, *Stivers v. Loyola Univ. Med. Ctr.*, No. 99 C 0482, 2000 WL 1263614, *1 (N.D. Ill. 2000). But Carroll herself has acknowledged that she "was terminated because of call, NOT anything else." (Statement of Pl.'s Additional Facts ¶ 50.) The court agrees. Carroll's inconsistent speculations about Merrill Lynch's motives do not create a genuine issue of material fact.

## **CONCLUSION**

On reconsideration, the court adheres to its conclusion that Defendants are entitled to judgment as a matter of law on all of Plaintiff's claims. Defendants' motion to strike [200] is terminated as moot. This order is final and appealable.

                                                ENTER:

Dated: January 10, 2012                    _____
                                           REBECCA R. PALLMEYER
                                           United States District Judge